IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GIL A. MILLER, as Receiver for IMPACT PAYMENT SYSTEMS, LLC, and IMPACT CASH, LLC,<br><br>Plaintiff,<br>v.<br><br>LARRY PARKER, SR., an individual, and LILLI PARKER, an individual,<br><br>Defendants. | **MEMORANDUM DECISION and ORDER GRANTING RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>Case No. 1:12-cv-61-DN-EJF<br><br>District Judge David Nuffer |

Defendants Larry and Lilli Parker (the Parkers) are investors in Impact Payment Systems, LLC and Impact Cash, LLC (together, Impact). Plaintiff is the court-appointed receiver in *SEC v. Clark*.[1] For the benefit of the estate, the Receiver seeks the return of the amount the Parkers received from Impact in excess of their investments as a fraudulent transfer. The Receiver filed a motion for summary judgment[2] and the Parkers did not respond. To prevail on a motion for summary judgment the Receiver must show that there is "no genuine dispute as to any material fact and that [the Receiver] is entitled to judgment as a matter of law."[3] This order grants the motion for summary judgment, declaring that the Parkers must return to the estate the amount they received from Impact in excess of their initial investment, plus post-judgment interest.

---

[1] Case No. 1:11-cv-46-DN (Impact Payment Systems, LLC and Impact Cash, LLC are named defendants).

[2] Receiver's Motion for Summary Judgment and Memorandum in Support (Motion), docket no. 34, filed May 28, 2013.

[3] Fed. R. Civ. P. 56(a).

## UNDISPUTED FACTS

The following factual statements from the Receiver's motion for summary judgment are not disputed.

1. The Parkers invested $462,000 in Impact. However, $252,000 of that money did not belong to the Parkers, but was money raised from John & Priscilla Van Osdel. The Van Osdels filed a claim with the receivership for the return of their investment. The Receiver has validated the Van Osdels' claim.[4]

2. The Parkers received payments from Impact totaling $634,600 (this total includes the above referenced $252,000). In total, the Parkers received $172,600 more from Impact than they invested.[5]

3. From August 29, 2007 to March 31, 2009, Impact made payments directly to the Parkers' personal account. From April 1, 2009 to October 29, 2010, Impact made payments to a bank account controlled by the Parkers, but in the name of Parker-Morris Financial Investments LLC.[6]

4. Parker-Morris Financial Investments LLC (Parker-Morris) is a Utah limited liability company that was registered in April 2007.[7] Gary Henrie was the registered agent of Parker-Morris and John Scott Clark was its manager.[8]

5. Gary Henrie is former legal counsel for Impact.[9]

---

[4] *See* Expert Report of David Bateman, dated March 29, 2013 (Bateman Report) at 13, attached as Exhibit A to Motion, docket no. 34-1.

[5] *See id.* at 12-13.

[6] *See* Declaration of David Bateman, dated May 16, 2013, ¶¶ 7 and 8, attached as Exhibit B to Motion, docket no. 34-4.

[7] *See* Certified Copy of Articles of Organization for Parker-Morris, dated April 6, 2007, attached as Exhibit C to Motion, docket no. 34-5.

[8] *Id.*

[9] Declaration of Gary R. Henrie, dated June 13, 2012, ¶¶ 2-3, attached as Exhibit D to Motion, docket no. 34-6.

6. In 2009, Company Management Fund, LLC replaced John Scott Clark as the manager of Parker-Morris.[10] Company Management Fund, LLC was managed by Gary Henrie alone.[11]

7. The Utah Division of Corporation's records reflect that the Parkers have never been members or managers of Parker-Morris.

8. This Court has already determined that Impact was operated as a Ponzi scheme.[12]

9. Gil A. Miller was appointed as Receiver in this matter on March 25, 2011.[13] Mr. Miller has concluded that Impact was operated with the characteristics of a Ponzi scheme since at least 2006.[14]

10. Mr. Miller and the accountants working with him conducted a thorough analysis of Impact's business operations and its accounting records. They relied on the contemporaneously kept records at Impact and on bank records obtained by subpoena.[15] A detailed description of the methods employed is contained in the expert reports of Mr. Bateman and of Gil A. Miller.

11. Impact commingled investor funds through intercompany and inter-account transfers.[16]

---

[10] *See* Certified Copy of Summary of Online Changes for Parker-Morris, dated June 2, 2009, attached as Exhibit E to Motion, docket no. 34-7.

[11] *See* Certified Copy of Articles of Organization for Company Management Fund, LLC, attached as Exhibit F to Motion, docket no. 34-8.

[12] *See* Order on Receiver's Motion to Approve Plan of Distribution at 4, ¶ 4, docket no. 184, filed May 11, 2012 and Order at 2, docket no. 360, filed April 10, 2013 (each filed in *SEC v. John Scott Clark et al.*, Case No. 1:11-cv-46-DN).

[13] Order Appointing Receiver, Imposing Asset Freeze and Prohibiting Destruction of Documents at 2, ¶ 2, docket no. 8, filed March 25, 2011 in *SEC v. Clark et al.*, Case No. 1:11-cv-46-DN.

[14] *See* Expert Report of Gil A. Miller at 3, dated March 29, 2013 (Miller Report), attached as Exhibit G to Motion, docket no. 34-9.

[15] *See* Bateman Report at 5; Miller Report at 13.

[16] *See* Bateman Report at 5-8.

12. Although Impact purported to maintain balance records for each investor, those records were inaccurate. According to an e-mail from one of the accounting employees at Impact to Scott Clark, many of the investor accounts should have had negative cash balances. At the time of his e-mail, August 9, 2010, there was a total negative balance of more than $8.3 million.[17]

13. In order to make distributions to investors who had a negative balance, Impact's accountants would book entries in the accounting records labeled as "temp loans," effectively taking money that had been accounted for as belonging to one investor and paying it to another. In reality, no transfer of funds was necessary as all of the money was in a single account.[18]

14. Tori Jackson, who filled an accounting position with Impact, testified that distributions were sent to investors when companies had negative balances.[19]

15. Impact Payment Systems had losses totaling $1,056,055 as of December 31, 2009.[20]

16. Impact and its related companies did not show an operating profit in any year when distributions to investors were made. The Impact entities realized a collective net loss of nearly $3 million during that time.[21] Nevertheless, they distributed over $52.6 million.[22]

17. When Impact's records include an appropriate bad debt adjustment, none of the $52.6 million in payments could have been made with operating profits. The only source for these distributions was from principal invested by other investors.[23]

---

[17] *See id.* at 8 n.11.

[18] *See id.* at 8.

[19] Jackson Beutler Dep. 123:10, May 9, 2011(relevant portions attached as Exhibit H to Motion, docket no. 34-10).

[20] *See* Bateman Report at 8.

[21] *See id.* at 11.

[22] *Id.*

18. Dirk Pace, an Impact accounting employee, testified that since the time he was hired by the company in September 2008, it recorded a loss each year and used investor money to cover those losses.[24]

19. One of Impact's accountants, Brandon Cowley, testified in his deposition that new investor money that was supposed to be used to fund payday loans came into Impact accounts and left the accounts within the same week to pay out old investors who had requested dividend payments or liquidation proceeds.[25]

20. Impact investors were promised large returns for their investments. Some investors were promised up to an 80% annual return. Others were told they would double their money in a year, or even within months. Investors were typically led to believe they were making between 30% and 40% in annual returns.[26]

21. Impact used investor funds that were supposed to be used for payday loans to cover expenses.[27]

### Fraudulent Transfer Law and the Ponzi Presumption

Under the Utah Uniform Fraudulent Transfer Act,

> a transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor; or without receiving a reasonably equivalent value in exchange for the transfer.[28]

---

[23] *Id.*

[24] Pace Dep. 17:12, October 7, 2011 (relevant portions attached as Exhibit I to Motion, docket no. 34-11).

[25] Cowley Dep. 28-29, May 24, 2011 (relevant portions attached as Exhibit J to Motion, docket no. 34-12).

[26] *See* Miller Report at 8.

[27] *See id.* at 10.

[28] Utah Code Ann. § 25-6-5(1)(a), (b).

The Receiver's burden of proving actual intent on summary judgment is conclusively established by proving the entities under his control were operated as a Ponzi scheme.[29]

Under the Uniform Fraudulent Transfer Act (UFTA), once it is established that a debtor acted as a Ponzi scheme, all transfers by that entity are presumed fraudulent.[30] "Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers."[31] Once a receiver proves a company operated as a Ponzi scheme, he has conclusively established that it transferred investment returns with the intent to defraud the investors, making the transfers to the investors "fraudulent transfers" within the meaning of the UFTA.[32]

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[33] Based on this standard, and for the reasons mentioned above, the Court grants the Receiver's motion for summary judgment.

## ORDER

IT IS HEREBY ORDERED that the Receiver's Motion for Summary Judgment[34] is GRANTED.

---

[29] *See Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (citing *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)).

[30] *See Wing v. Dockstader*, No. 11-4006, 2012 WL 2020666, at *2 (10th Cir. June 6, 2012) (citing *Donnell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)).

[31] *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (citations omitted).

[32] *Wing v. Gillis*, No. 2:09-cv-314-DB-BCW, 2012 WL 994394, at *2 (D.Utah 2012).

[33] Fed. R. Civ. P. 56(c).

[34] Docket no. 34.

IT IS FURTHER ORDERED that Larry Parker, Sr., and Lilly Parker, jointly and severally, must return $172,600 to the receivership estate, plus interest at the statutory post-judgment rate pursuant to 28 U.S.C. §§ 1961(a) and 1961(b).

IT IS FURTHER ORDERED that trial and related dates are STRICKEN.  The clerk is directed to close the case.

Signed October 22, 2013.

                                                  BY THE COURT

                                                  _____
                                                  District Judge David Nuffe